IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

FILED

MAR 1 1 2013

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

**DOYLE EDWARD McBEE,**

**Plaintiff,**

v.

**Civil Action No. 2:12cv64**
**(The Honorable John Preston Bailey)**

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Doyle Edward McBee ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant" and sometimes "Commissioner") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

### I. Procedural History

Plaintiff protectively filed applications for SSI and DIB on November 25, 2009, alleging disability since December 1, 2005, due to herniated disc in his lower back, acid reflux, seizures, and depression. The state agency denied Plaintiff's applications initially and on reconsideration (R. 61-64). Plaintiff requested a hearing, which Administrative Law Judge Mark M. Swayze ("ALJ") held on October 59, 2011, and at which Plaintiff, represented by counsel, Phillip Isner, and Larry Bell, a vocational expert ("VE"), testified (R. 10-60). On November 18, 2011, the ALJ entered a decision

finding Plaintiff was not disabled (R. 68-84). On June 27, 2012, the Appeals Council denied Plaintiff's request for review (R. 6-9). On July 17, 2012, the Appeals Council set aside its June 27, 2012, decision denying Plaintiff's request for review in order to "consider new information." After consideration of the new information, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-5).

## II. Statement of Facts

Plaintiff was born on March 11, 1961, and was fifty (50) years, eight (8) months old at the time the ALJ rendered his decision (R. 150). Plaintiff completed his GED in 1977 (R. 196). Plaintiff's past employment included that of construction worker, sergeant in the United States Army, maintenance worker, maintenance technician, and boiler room operator (R. 198).

On February 5, 2004, Plaintiff asked Dr. Rosenblum to "re do [his] happy juice" because he was having "problems [with] orgasm." He was "feeling better overall"; his affect was bright. Dr. Rosenblum prescribed Zoloft (R. 258). Dr. Rosenblum prescribed Zoloft to Plaintiff on June 11 and Klonopin on August 6, 2004 (R. 258). On August 10, 2004, Plaintiff's wife told Dr. Rosenblum that Plaintiff had "quit Zoloft cold turkey." She stated Plaintiff had "hit her" and "moved out" (R. 257).

On November 9, 2005, Plaintiff informed Dr. Rosenblum that he had been "in remission from depression [for a] long time" and "Klonopin worked better than Zoloft." He stated he felt increased stress and anger but was not suicidal. His affect was good. Plaintiff had been fired from a job and had been employed at another. He was "working things out" with his wife (R. 257).

Plaintiff presented to Dr. Gupta on December 23, 2005, to establish treatment at the Louis A. Johnson Veterans' Administration Medical Center ("VA"). Plaintiff stated he was unable to stand on a hard surface and pain limited his activities. He could walk for one-half (½) to one (1) mile

before he had to stop due to pain. Riding in a car worsened his pain. Plaintiff stated he had acid reflux. He had no shortness of breath, headaches, dizziness, or pain. Plaintiff's prior medical history was positive for acid reflux, degenerative joint disease, obesity, and back pain. Plaintiff drank two (2) or three (3) beers on a weekly basis. Plaintiff weighed two-hundred and forty (240) pounds (R. 263). Plaintiff's examination was normal. He had negative straight leg raising test; he could walk on this toes and heels; he could tandem walk; and he could stand on either leg. Plaintiff reported he did not take any prescription medications. His gastroesophageal reflux disease ("GERD") was controlled with Rolaids, Tums, or over-the-counter Zantac and diet. Plaintiff treated his knee pain with Motrin or Tylenol. Plaintiff informed Dr. Gupta that he managed his depression symptoms by exercising. He refused medication or referral to a mental health counselor (R. 264). Dr. Gupta prescribed ibuprofen and cyclobenzaprine for pain treatment. He advised Plaintiff to lose three (3) or four (4) pounds in the next month (R. 264). Plaintiff's blood work showed low B12; all other lab results were normal (R. 266). Plaintiff's x-ray showed "loss of normal lumbar lordotic curve c/w chronic lumbar strain, slight disc space narrowing at L2-L3 and at L4-L5 and at L5-S1, anterior marginal osteophytes at superior aspect of L5 and anteriorly and superiorly at L3 and both along the anterior/superior, and inferior aspect of L2, SI joints normal." Dr. Gupta diagnosed degenerative joint disease. Other than medicating with ibuprofen and cyclobenzaprine, Dr. Gupta opined "no other action [was] needed at present" (R. 262-63).

During Plaintiff's December 23, 2005, new-patient screening at the VA, he was found to be negative for PTSD. Plaintiff stated that, during the past month, he had been "bothered by feeling down, depressed or hopeless." Plaintiff had no barriers to learning (R. 267). Plaintiff reported he performed the following activities of daily living: eating, bathing, grooming, dressing, toilet habits,

walking, climbing stairs, descending stairs, and getting up from a chair or bed. Plaintiff had no difficulty with unsteadiness, vision, falling or pain (R. 268).

On March 6, 2006, Sharon Joseph, Ph.D., completed a Mental Status Examination of Plaintiff. Plaintiff reported he had a herniated disc, was depressed, had acid reflux, and had knee damage. Plaintiff quit attending high school in the tenth grade and obtained his GED. He was divorced and lived alone (R. 273). Plaintiff reported his last job was from May 25, 2001, to October 25, 2004, and he was fired from that job because "'[t]hey claimed [he] lied.'" He received disability payments from the military. Plaintiff reported he medicated with clonazepam, cyclobenzaprine, and Motrin. Plaintiff stated he no longer medicated with Zoloft because it "'even[ed] [him] out too much.'" He smoked two (2) or three (3) cigarettes per week, drank eight (8) cups of coffee per day, and drank five (5) or six (6) bottles of beer per week. He had been arrested in the past (R. 274).

Plaintiff stated he had never had a head injury or a seizure. He stated he had been treated by Dr. Rosenblum for two and one-half (2 ½) years for depression and anxiety and he had been engaged in marriage counseling for three (3) months in 2005 (R. 274). Dr. Joseph noted Dr. Gupta's December 23, 2005, examination notes were available to her for review, which showed Plaintiff was positive for major depressive disorder, declined treatment for depression, declined medication management for depression, and declined further assessment of his diagnosis of depression (R. 275).

Upon examination, Dr. Joseph found Plaintiff was alert, cooperative, and oriented, times three (3). Plaintiff reported he had hearing loss and was "technically blind in his right eye." Plaintiff reported sleep disturbances; he had no suicidal or homicidal ideations. Plaintiff stated he felt "'betrayed a lot.'" He got "upset with things that happened in his life." He said he did "not want to get up and go and do things." Plaintiff's appetite was normal. Dr. Joseph found Plaintiff had "no

4

perceptual thinking disturbances"; no preoccupations, obsessions, or compulsions; normal speech; no psychomotor disturbances; adequate insight; "somewhat anxious" affective expression; average eye contact; calm motor activity; and appropriate posture and eye contact (R. 275).

Plaintiff reported the following activities of daily living: woke at 6:00 a.m.; dozed; watched television until 10:30 a.m., again in the afternoon, and then in the evening; attended meetings at "the Eagles"; went to bed "around 8 p.m."; made his own bed; climbed and descended stairs; remembered to turn off stove; and walked to the mailbox. Plaintiff was unable to vacuum; was unable to wash dishes because it required standing for too long; did not cook; did not put groceries away; did not mow the lawn; did not take out garbage; did not grocery shop; and did not drive (R. 275).

Dr. Joseph found the following: Plaintiff's immediate memory was within normal limits; recent memory was moderately impaired; remote memory was within normal limits; concentration was moderately impaired; and judgment was within normal limits. Dr. Joseph found Plaintiff "appear[ed] to have depression, which appear[ed] to be relatively longstanding . . . . He [was], however, currently not taking any medication for it. He [was] taking medication for anxiety and [did] appear to have some anxiety symptoms, which may be related to his depression." Dr. Joseph diagnosed major depression, recurrent, moderate; anxiety disorder, NOS; and pain disorder. His prognosis was fair. He could manage his own benefits (R. 276).

Plaintiff's May 26, 2009, chest x-ray showed normal results (R. 362-63). His cervical spine x-ray showed "mildly diminished intervertebral disc spaces at C5-C6 and C6-C7 levels. Otherwise, essentially unremarkable cervical spine series" (R. 362). Plaintiff cervical spine MRI showed degenerative disc disease, preserved spinal alignment, no spondylolisthesis, and no prevertebral soft tissue swelling. There was a "protrusion type herniation" at C6-C7, which resulted in central canal

and foraminal stenosis. The cervical spinal cord maintained normal caliber and signal intensity. The remaining intervertebral disc levels showed no significant stenosis or neural foramina (R. 361).

On August 5, 2009, Plaintiff was admitted to the VA for "new onset seizure" (R. 285). Dr. Sang found Plaintiff experienced a grand mal seizure "while doing some work." During the seizure, he experienced urinary incontinence. His brain MRI was unremarkable (R. 286). Plaintiff stated he did not recall "the events." Plaintiff stated he experienced back pain and may have "twisted" his back when he fell during the seizure (R. 353) Plaintiff stated he drank four (4) to six (6) cans of beer with a "shot of vodka several times a week" (R. 327). Plaintiff stated he experienced pain in his back and was able to "function on the current treatment plan" (R. 324). Plaintiff's seizure was treated with Dilantin. The "new onset seizure" had been resolved. He was discharged to home, where he lived alone (R. 286, 340). It was noted Plaintiff medicated with cyclobenzaprine, bupropion, trazodone, ranitidine, acetaminophen, tramadol, and Lodine (R. 286-87). Plaintiff was instructed to not drive until he was seizure free for one (1) year (R. 319). Plaintiff was instructed to limit his alcohol intake to "2 cans beer or liquor shots per day" (R. 322). Medical professionals attempted to contact Plaintiff telephonically for a "post discharge follow up," but Plaintiff was unavailable and did not return the phone calls (R. 313).

Plaintiff presented to Dr. Michels on August 26, 2009, for an unscheduled, follow-up examination relative to his "hospitalization for grand mal seizure . . . ." Plaintiff reported he had "stopped taking all medications (including Dilantin) 'as soon as [he] left the hospital.'" Plaintiff had experienced no seizures since August 5, 2009. Plaintiff reported he felt "fine," except for back pain and "intermittent sciatica which awakene[d] him 'every night.'" Plaintiff reported the epidural steroid lumbar injections he received at the pain clinic provided pain relief for three (3) weeks.

Plaintiff stated his depression was worse since he had stopped medicating with Wellbutrin. Upon examination, Plaintiff had no "localizing neuro signs or deficits." Dr. Michels diagnosed "uncomplicated grand mal seizure disorder; chronic back pain[;] intermittent bilateral sciatica unchanged; exacerbation of depression off bupropion." Dr. Michels ordered an EEG and neurological consultation. He "strongly advised" Plaintiff to resume medicating with Dilantin, but Plaintiff refused. Plaintiff stated he would "consider" medicating with Wellbutrin. Dr. Michels prescribed hydrocodone and discontinued Plaintiff's prescription for tramadol (R. 310-12).

Plaintiff presented to Dr. Chan at the VA on October 22, 2009, with complaints of increased depression due to "decreased production for unemployment," low back pain, and "recent generalized seizure disorder." Dr. Chan noted that Plaintiff had medicated with Dilantin and had not "had another seizure spell again." Dr. Chan "suggested" Plaintiff "wean himself off Bupropion" because bupropion could "trigger a seizure spell when he already ha[d] it." Dr. Chan prescribed venlafaxine in place of bupropion"; he discontinued Plaintiff's prescription for Paxil because Plaintiff stated he could not tolerate it. Plaintiff reported his sleep was "good" and appetite was "fair." Plaintiff reported he was depressed and felt hopeless "at times." He had no suicidal or homicidal ideations; he had no hallucinations. Dr. Chan found Plaintiff was alert, well groomed, casually dressed, oriented, and dysphoric. His affect and mood were restricted, anxious and depressed. Plaintiff's thought process and content were coherent; his cognition, insight, and judgment were fair. Dr. Chan diagnosed major depressive disorder and chronic pain syndrome (R. 302). Plaintiff's GAF was 45-50. Plaintiff was instructed to return in three (3) months (R. 303).

Dr. Michels examined Plaintiff at the VA on October 30, 2009. It was noted there had been "no seizure activity since initial single episode in August; both tramadol and Wellbutrin have since

been discontinued; patient has not taken Dilantin since he left the hospital in August; he continue[d] to drink 3-4 shots of 'Jack Daniels' every week (replaced Budweiser 8-10 mos ago); patient now reports that paresthesias of UE's (sic) resolved during his hospital stay; also note multilevel cervical disc disease per 5/09 MRI and resolution of recent HX non-progressive tingling paresthesias of 4th and 5th fingers both hands" (R. 299). Dr. Michels noted Plaintiff was treated every three (3) months at the pain clinic with epidural injections. Plaintiff reported he experienced mid-thoracic spine pain, which was exacerbated by lying in the supine position "on a hardboard creeper or lying supine on a hardwood floor, but not otherwise by lying supine." Dr. Michels' examination was normal. Plaintiff's upper extremity strength and radial pulses were normal; lower extremity gait, station, and coordination were normal; and pedal pulses and achilles reflexes were 2+ and symmetric. Plaintiff was diagnosed with multilevel cervical disc disease as per the May, 2009, MRI and radicular paresthesias. Plaintiff refused to resume medicating with Dilantin (R. 299). Plaintiff medicated with acetaminophen, cyclobenzaprine, phenytoin, ranitidine, trazodone, and venlafaxine (R. 293).

On November 20, 2009, Dr. Chan spoke with Plaintiff on the telephone relative to his having stopped medicating with venlafaxine due to side effects. Dr. Chan prescribed citalopram (R. 292).

On November 24, 2009, Plaintiff returned to the pain clinic at the VA. He stated his pain was "4 . . . out of 10" and he got "good relief from the injections and remain[ed] active." He stated the previous epidural injection relieved his back pain for two (2) months. Upon examination, Dr. Lucci found Plaintiff had "improved." He diagnosed lumbar spinal stenosis and disc displacement (R. 289, 292). Plaintiff received a lower spine epidural injection of lidocaine (R. 280, 290).

On January 22, 2010, Dr. Michels prescribed to Plaintiff. He stated his pain was zero (0) on a scale of one (1) to ten (10) and his function had "improved" (R. 428-29).

Plaintiff presented to Dr. Chan on January 22, 2010, with complaints of experiencing sexual side effects from citalopram. Dr. Chan referred Plaintiff to his "family doctor for evaluation for Levitra . . . to help with his sexual potency." Plaintiff reported he slept for five (5) or six (6) hours a night. His appetite was fair, his mood was depressed, and he felt helpless and hopeless. Plaintiff stated he, "at times," had "brief[,] passive[,] fleeting suicidal ideation" but no intent or plan. Plaintiff stated he kept "in touch" with his children "almost daily." He had a "new relationship with a young girlfriend." Dr. Chan prescribed Remeron to "help with depression and sleep." Dr. Chan found Plaintiff was alert. His mood was restricted, anxious, and depressed. Plaintiff was oriented. His speech was fluent and normal. His thought process and content were coherent. His cognition, insight, and judgment were fair. Dr. Chan diagnosed major depressive disorder, recurrent, moderate; chronic pain syndrome; and seizure disorder. Dr. Chan found Plaintiff's GAF was 45-50 (R. 425). Plaintiff was instructed to return in three (3) months (R. 423-424).

Dr. Sabio completed a consultative physical examination of Plaintiff on February 10, 2010, for herniated disk in Plaintiff's lower back, depression, acid reflux disease, and seizures. Dr. Sabio reviewed records from the VA. Plaintiff reported he treated depression with Wellbutrin and two other medications, which he could not recall. Plaintiff complained of not having a sex drive, being "up and down" throughout the night, being tired, and having no energy. Plaintiff reported he had a history of seizures since the age of forty-eight (48); his last seizure was six (6) months earlier. Plaintiff reported his seizures had first been treated with Wellbutrin and tramadol, but he had been "taken off" those medications (R. 368). Plaintiff reported he realized "significant relief" from GERD symptoms with Zantac. Plaintiff reported he experienced cervical and lumbar spine pain for which he received epidural steroid injections, which provided relief for "about two weeks." Medication

gave Plaintiff "significant relief" from cervical spine pain. Plaintiff's lumbar pain radiated to his legs and caused him to lose control of his bladder sometimes. He had no numbness or tingling; however, he lost control of his legs and occasionally fell. Carrying twenty (20) pounds, sneezing, and coughing increased Plaintiff's cervical pain. Plaintiff's lumbar pain was increased with sitting or riding in a car for one (1) hour. Plaintiff reported the MRI of his lumbar spine showed herniated disks. Dr. Sabio did not have that record. Plaintiff reported he had diabetes, which he controlled with diet, and a history of hypertension (R. 369). Plaintiff reported he medicated with oxycodone and depression medications (R. 370). Plaintiff stated he "occasionally" drank whiskey (R. 369).

Upon examination, Dr. Sabio found Plaintiff was alert and oriented, times three (3), had a normal gait, and was stable at station. Examinations of Plaintiff's head, ears, eyes, nose, throat, neck, cardiovascular system, chest, and abdomen were normal. Plaintiff had no tenderness, redness, effusion, swelling, or inflammation in his shoulders, elbows, wrists, hands, hips, knees, and ankles. He had no Heberden nodes, Bouchard nodes, or rheumatoid nodules (R. 370). Plaintiff's femoral pulses were 2/2, symmetrical, and without bruits. Plaintiff had strong symmetrical pulses in his dorsalis pedis and posterior tibial arteries. He had tenderness of the spinous processes of the lumbar spine and over the T12-L1 vertebrae. There was no kyphosis or scoliosis (R. 371).

Plaintiff had restricted straight leg raising to seventy (70) degrees on the right and eighty (80) degrees on the left because of lumbar pain. Lumbar flexion was restricted to seventy (70) degrees forward and ten (10) degrees laterally to either side. Hip flexion was restricted at ninety (90) degrees on the right and one-hundred (100) degrees on the left due to lumbar pain (R. 371-72). Neurologically, Plaintiff was alert and oriented. His cranial nerves were grossly normal. His sensory function to light touch and pinprick was intact throughout. Plaintiff's motor strength was 5/5,

bilaterally, in both upper and lower extremities. His deep tendon reflexes were normal. He could walk on his heels, on his toes, and heel-to-toe tandem. He could stand on either leg. He could squat "halfway down." His fine manipulation was normal (R. 371). Dr. Sabio diagnosed degenerative disc disease, history of herniated lumbar disk, depression, history of seizures, and GERD (R. 372).

Dr. Boukhemis, a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff on February 26, 2010. Dr. Boukhemis found Plaintiff could occasionally lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 375). Dr. Boukhemis found Plaintiff could frequently climb ramps and stairs, balance, stoop, and kneel. Dr. Boukhemis found Plaintiff could occasionally climb ladders, ropes, scaffolds; crouch; and crawl (R. 376). Dr. Boukhemis found Plaintiff had no manipulative, visual, or communicative limitations (R. 377-78). Dr. Boukhemis found Plaintiff had no limitations regarding his exposure to fumes, odors, dusts, gases, and poor ventilation. Dr. Boukhemis found Plaintiff should avoid concentrated exposure to extreme cold and heat, wetness, humidity, and vibration. Dr. Boukhemis found Plaintiff should avoid even moderate exposure to hazards (R. 378). Dr. Boukhemis found Plaintiff was not fully credible and noted: "Spondylosis but no weakness or severe sensory deficit" (R. 379). Dr. Boukhemis found Plaintiff did not meet a listing relative to seizures. He reviewed Dr. Gupta's December 23, 2005, medical records; December 28, 2005, lumbar spine x-ray; May 26, 2009, MRI of his cervical spine; August 5 through August 7, 2009, VA hospital records and discharge notes; Dr. Michels' August 26, 2009, medical records; Dr. Michels' October 30, 2009, medical records; November 24, 2009, VA pain clinic records; and Dr. Sabio's February 10, 2010, consultative examination records (R. 381).

11

Thomas C. Stein, Ed.D., completed a consultative Mental Status Examination of Plaintiff on March 18, 2010. Plaintiff stated he experienced chronic low back pain, which was exacerbated by standing, walking. and sitting. Plaintiff stated the pain radiated to his knees and caused him to wake at night. Plaintiff stated pain "led to [his] developing a depression." Plaintiff also informed Dr. Stein that he had acid reflux and grand mal seizures (R. 382). Plaintiff stated he could not drive due to his seizure disorder; Plaintiff lived alone (R. 383). Plaintiff reported poor energy. He stated he "constantly" felt "down in the dumps." Plaintiff had no phobias, panic attacks, obsessive thinking, or obsessive behavior. Plaintiff was at not a suicide risk. Dr. Stein noted Plaintiff medicated with mirtazapine, trazodone, citalopram, hydrocodone with HCTZ, ranitidine, and phenytoin. Plaintiff stated he drank five (5) or six (6) mixed drinks during a week (R. 383).

Upon examination, Dr. Stein found Plaintiff was cooperative, polite, and subdued. He maintained good eye contact, provided adequate verbal responses, and had adequate conversation skills. Plaintiff was oriented, times four (4). Plaintiff's mood was depressed; affect subdued; thought process normal; thought content normal; insight adequate; judgment average; immediate and remote memories mildly deficient; recent memory normal; concentration average; and psychomotor behavior normal. Dr. Stein diagnosed pain disorder and major depression, recurrent (R. 384-85).

Plaintiff's activities of daily living were as follows: rose at 7:30 a.m.; took care of his personal hygiene; dressed; took medications; fixed and drank coffee; ate breakfast that was provided by his younger brother; watched television news; visited with a brother; watched television; fixed and ate lunch; took a one (1) hour nap; spoke with his children on the phone; fixed and ate dinner; cleaned the kitchen; watched television; took a shower; and retired to bed at 11:30 p.m. Plaintiff reported he did not require any assistance with his personal hygiene. He rarely cooked, cleaned, or

washed dishes. His brother helped him with his laundry. He did no yard work or gardening. He occasionally changed the oil in the automobile. He grocery shopped with help. He walked short distances and occasionally sat on the porch. He did not drive, hunt, fish, or read. Dr. Stein found Plaintiff was mildly deficient in his social functioning and concentration, persistence, and pace were within normal limits. Plaintiff could manage his own finances (R. 385-86).

James W. Bartee, Ph.D., completed a Psychiatric Review Technique of Plaintiff on March 26, 2010, He found Plaintiff had affective disorder, which was major depressive disorder, and somatoform disorder, which was pain disorder associated with general medical condition and pathological factors (R. 387, 390, 393). Dr. Bartee found Plaintiff was mildly limited in his activities of daily living, social functioning, and his concentration, persistence, and pace. Dr. Bartee found Plaintiff had no episodes of decompensation (R. 397).[1]

On April 8, 2010, Plaintiff reported to the VA pain clinic that his pain was at three (3) on a scale of one (1) to ten (10). His chief complaint was low back pain. He stated he had insomnia, poor appetite, weakness, and muscle spasms. Plaintiff described his pain as constant, "'dull" when he walked on a hard surface, and "intense" (R. 422). Plaintiff was given an epidural injection. He stated the "shots help[ed] for several months," he realized "good relief" from them, and he was able to "remain active" (R. 421). Plaintiff stated the last epidural injection relieved his pain for two and one-half (2 ½) weeks (R. 423).

On April 22, 2010, Plaintiff provided Dr. Chan disability forms from Plaintiff's lawyer; Dr. Chan assisted Plaintiff in completing the forms. Plaintiff stated his low back pain was eight (8) on

---

[1]Decompensation: In psychiatry, failure of defense mechanism resulting in progressive personality disintegration. *Dorland's Illustrated Medical Dictionary*, 32nd Ed., 2012, at 475.

a scale of one (1) to ten (10). Plaintiff reported difficulty sleeping, poor appetite, low energy, chronically depressed mood, feeling helpless and hopeless, labile mood, mood swings, feeling angery and yelling and screaming. Plaintiff stated he had a "brief[,] passive[,] fleeting suicidal ideation" but no plan or intent. Plaintiff reported the current psychological medications were "helpful except sexual side effects." Dr. Chan noted Plaintiff was alert, well groomed, oriented, and dysphoric (R. 413). The Patient Health Questionnaire ("PHQ-9") was administered to Plaintiff. He scored seven "7", which was "suggestive of mild depression" (R. 549). Plaintiff's mood was restricted, anxious, and depressed. His speech was normal, fluent, and relevant. Plaintiff's thought process and content were coherent. Dr. Chan found Plaintiff's cognition, insight, and judgment were fair. He diagnosed major depressive disorder. Dr. Chan found Plaintiff's GAF was 45-50. Plaintiff was instructed to return in three (3) months (R. 414). Plaintiff medicated with citalopram, cyclobenzaprine, hydrocodone, Dilantin, ranitidine, and trazodone (R. 415-16).

Dr. Chan "helped" Plaintiff complete a Mental Impairment Questionnaire on April 22, 2010 (R. 413). Dr. Chan noted Plaintiff had been diagnosed with major depression, recurrent; chronic depression; anxiety; chronic pain; osteoarthritis; chronic low back pain; GERD; vitamin B12 deficiency; and seizure disorder. As to "[t]reatment and response," Dr. Chan noted Plaintiff had responded to current psychotropic medications, which included citalopram, mirtazapine, and trazodone. The side effects to medication were sexual impotency and loss of libido. Dr. Chan listed the following as clinical findings that demonstrated the severity of Plaintiff's impairments and symptoms: "chronic 5-6 hrs. of broken sleep, chronic depressed mood, helplessness, hopelessness with brief passive fleeting suicidal ideations with no plan or intent because he cares for his family - c/o chronic low back/leg pain level up to 8/10 (10 = worse) with poor appetite, anger, poor impulse

14

control." Dr. Chan found Plaintiff's prognosis was "very guarded" (R. 485). Dr. Chan listed the following as Plaintiff's signs and symptoms: anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with weight change; decreased energy; thoughts of suicide; blunt, flat or inappropriate affect; feelings of guilt or worthlessness; mood disturbance; difficulty thinking or concentrating; emotional withdrawal; memory impairment – short, intermediate or long term; and sleep disturbance (R. 486). Dr. Chan found the following as to Plaintiff's mental abilities and aptitudes needed to do *unskilled* work: Plaintiff was unable to meet competitive standards in understanding, remembering, and carrying out very short and simple instructions; making simple work-related decisions; and asking simple questions or requesting assistance (R. 487). Dr. Chan found Plaintiff had no useful ability to function in the following areas: remember work-like procedures; maintain attention for a two (2) hour segment; maintain regular attendance and be punctual within customary, usually strict, tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; and be aware of normal hazards and take appropriate precautions. Dr. Chan did not "explain limitations . . . and include the medical/clinical findings that support this assessment" as instructed to do on the form (R. 488-89). Dr. Chan found the following as to Plaintiff's mental abilities and aptitudes needed to do *semi skilled* and *skilled* work: Plaintiff had no useful ability to function relative to understanding

15

and remembering detailed instructions, carrying out detailed instructions, setting realistic goals or making plans independently of others, and dealing with stress of semi skilled and skilled work. Dr. Chan did not "explain limitations . . . and include the medical/clinical findings that support this assessment" as instructed to do on the form. As to Plaintiff's mental abilities and aptitudes needed to do *particular types* of jobs, Dr. Chan found Plaintiff was unable to meet competitive standards in maintaining socially appropriate behavior, traveling to unfamiliar places, and using public transportation. Dr. Chan found Plaintiff had no useful ability to function relative to interacting appropriately with the general public and adhering to basic standards of neatness and cleanliness. Dr. Chan did not "explain limitations . . . and include the medical/clinical findings that support this assessment" as instructed to do on the form (R. 489).

Dr. Chan noted that Plaintiff's "serious symptoms of depression made his pain level worse" (R. 490). Dr. Chan found the following functional limitations as to Plaintiff: moderate restriction of activities of daily living; extreme difficulties in maintaining social functioning; and extreme difficulties in maintaining concentration, persistence, or pace. Dr. Chan found Plaintiff had had four (4) or more episodes of decompensation within a twelve (12) month period, each lasting (2) weeks (R. 491). Dr. Chan noted that Plaintiff had a "medically documented history of a chronic organic mental, schizophrenic, etc., or affective disorder of at least 2 years duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: See # 5 above," which was the listing of the clinical findings in the questionnaire (R. 491). Dr. Chan then listed the following to support his findings as to Plaintiff's functional limitations: three (3) or more episodes of decompensation within the past twelve (12) months, each lasting (2) weeks; a "residual disease

16

process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate"; and "[c]urrent history of 1 or more years inability to function outside a highly supported living arrangement with indication of continued need for such an arrangement (R. 492-93).

Dr. Chan, in response to the question of how frequently Plaintiff's impairment and treatment would cause him to be absent from work, Dr. Chan wrote, "Patient is unemployable." Dr. Chan found Plaintiff's impairment had lasted or would last twelve (12) months and Plaintiff was not a malinger. Dr. Chan found Plaintiff's impairments reasonably consistent with his symptoms and functional limitations as described. Dr. Chan opined that Plaintiff had "chronic depressed mood w/impaired attention, concentration, and short term memory along with chronic low back and leg pain which interfered with any employment due to physical and mental impairments" (R. 494).

Plaintiff contacted the VA and requested a prescription for hydrocodone on August 4, 2010. Plaintiff stated his functional status had improved. His pain was zero (0) on a scale of one (1) to ten (10). Plaintiff was prescribed hydrocodone (R. 541).

Frank Roman, Ed.D., a state-agency psychologist, completed a Psychiatric Review Technique of Plaintiff on August 9, 2010. He found Plaintiff was positive for affective disorder and his symptoms were decreased energy and feelings of guilt and worthlessness (R. 503, 506). Dr. Roman found Plaintiff had mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. Dr. Roman found Plaintiff had experienced no episodes of decompensation (R. 513). Dr. Roman reviewed Dr. Chan's January 22 and April 22, 2010, medical records. Dr. Roman opined Plaintiff's depression was non severe (R. 515).

Dr. Reddy, a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff on August 6, 2010. Dr. Reddy found Plaintiff could occasionally lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 496). Dr. Reddy found Plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds. Dr. Reddy found Plaintiff could occasionally balance, stoop, kneel, crouch, and crawl (R. 497). Dr. Reddy found Plaintiff had no manipulative, visual, or communicative limitations (R. 498-99). Dr. Reddy found Plaintiff should avoid concentrated exposure to extreme heat and cold, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards. Dr. Reddy found Plaintiff had no limitations regarding his exposure to wetness and humidity (R. 499). Dr. Reddy noted Plaintiff lived alone and cared for himself (R. 500). Dr. Reddy reviewed medical records from the VA and Dr. Boukhemis (R. 502).

Plaintiff presented to Dr. Chan on August 9, 2010, and reported he had "stopped taking all 3 psych meds" that Dr. Chan had prescribed because the medications made his "mood/anger worse" and "negatively" affected "his sex life." Plaintiff reported he had received an epidural injection for pain; his pain was a level zero (0) on a scale of one (1) to ten (10), except when standing. Plaintiff slept for six (6) hours each night; his mind did not race. Plaintiff's mood was depressed "at times," but he "denied feeling hopeless." Plaintiff reported he had no suicidal ideations (R. 537). Plaintiff reported he drank two (2) to four (4) times a month (R. 540). Dr. Chan referred Plaintiff to individual therapy. Dr. Chan noted Plaintiff was alert, engaging, and oriented. Plaintiff's affect and mood were restricted and anxious. Plaintiff's speech was normal. His thought process and content were coherent. Plaintiff's cognition, insight, and judgment were fair. Dr. Chan diagnosed major

depressive disorder, moderate. Plaintiff's GAF was 55 (R. 538).

Plaintiff presented to Donald E. Summers, Ph.D., a psychologist, on August 11, 2010, upon referral from Dr. Chan, for individual psychological therapy. Plaintiff reported "he decided he did not want to take any antidepressant medications because he believed it was negatively impacting his ability to perform sexually and after indicating this to his psychiatrist was referred here." Plaintiff stated, "I really don't think I need to see a psychologist." Plaintiff reported he lived alone, his daughter lived nearby, and he cared for his two-year old granddaughter "regularly." Plaintiff's son was in the National Guard and was scheduled to be deployed; this caused Plaintiff "some concern." Plaintiff reported he had a "long history of depression" due to his back "problem and the limitations it has caused." Plaintiff reported that "[c]urrently[,] the pain [was] decreased and he decided he would prefer not to have some of the side effects of medication." Plaintiff was "no longer together" with his "lady friend" (R. 536). Plaintiff drank a "beer or two daily with friends" (R. 536-37). Plaintiff stated he would "like to be able to work again but does not believe it is likely he will be able to return to his physically demanding job." Plaintiff reported he spent "most of his time with family or some friends and [did] things around his home including working on cars for others" (R. 537).

Dr. Summers found Plaintiff's mood was "basically euthymic with a slightly irritable but broad and appropriate affect." Plaintiff denied "any serious depression recently; he was in no acute distress. He denied most mental health related symptoms." Plaintiff was alert and fully oriented. Plaintiff did not schedule a further psychological therapy session. Dr. Summers assessed "major depression, recurrent, moderate (by history) apparently currently stable." Plaintiff chose not to take medication for depression and he stated he did not need to meet for therapy (R. 537).

Plaintiff was examined by Dr. Rubi on August 30, 2010; his examination was normal (R.

531-32). Plaintiff's blood sugar was elevated, and he was instructed to avoid eating sweets and drinking sodas (R. 533). It was noted Plaintiff "would benefit from participation in a MOVE/weight management program." Plaintiff refused to participate (R. 533). Plaintiff was prescribed Vicodin for pain. Dr. Rubi noted Plaintiff was medicating with "[D]ilantin now." Dr. Rubi found that Plaintiff's MRI was negative and, if Plaintiff's EEG was negative, he would begin to "wean [Plaintiff] off" Dilantin (R. 530). Plaintiff stated he had experienced no changes to his activities of daily living during the past twelve (12) months (R. 535).

Plaintiff presented to the pain clinic on September 1, 2010, for follow-up treatment (R. 526). Plaintiff reported his pain was zero (0) on a scale of one (1) to ten (10). Plaintiff stated he continued to get "good relief from the injections and remain[ed] active." Plaintiff stated he had realized "very good relief from the last shot" (R. 527). Plaintiff reported walking caused sharp, aching pain. Plaintiff stated his pain was intermittent (R. 528). Dr. Lucci noted Plaintiff's physical examination was "improved." Dr. Lucci found there was "no shot needed" (R. 527).

On October 4, 2010, Plaintiff telephoned Dr. Chan and requested that Dr. Chan prescribe an antidepressant "to help with his anxiety and depression." Plaintiff reported he had had "negative side effects" to citalopram, mirtazapine, and trazodone. Dr. Chan prescribed venlafaxine (R. 524).

Plaintiff's December 14, 2010, electrocardiogram was normal (R. 563).

On December 30, 2010, Dr. Vogt, a psychiatrist at the VA, completed a depression screening and evaluation of Plaintiff. Plaintiff stated he was not feeling hopeless about the present or the future. Plaintiff informed Dr. Vogt that he was "doing well" (R. 594). Plaintiff stated he had been "sitting in front of the TV or the computer[] with poor energy and poor interest." Plaintiff stated his pain had "been under fairly good control." Plaintiff stated his mood was a "3 on a scale of one to

10, with 10 being the best." Plaintiff reported he was sleeping "fairly well." He stopped medicating with mirtazapine "because he felt sedated in the morning." He had no other side effects from medication. Plaintiff's appetite was good. Dr. Vogt found Plaintiff was calm, cooperative, engaging, and he made good eye contact. Plaintiff's speech and thought process were normal. He had no suicidal or homicidal ideations. Dr. Vogt opined Plaintiff's mood was depressed, affect was sad, cognitive functioning was intact, insight was good, and judgment was good. Dr. Vogt diagnosed major depression, recurrent and moderate. Dr. Vogt increased Plaintiff's dosage of venlafaxine and continued Plaintiff's prescription of amitriptyline. He instructed Plaintiff to return in two (2) months for a follow-up examination with Dr. Chan (R. 595).

Dr. Lucci administered an epidural lumbar injection to Plaintiff on January 20, 2011 (R. 593).

On March 9, 2011, Dr. Rubi examined Plaintiff. He noted Plaintiff's EEG was negative; his GERD was uncontrolled; and he was "stable off meds" as to his seizure disorder. Plaintiff stated he experienced constant pain" that, "at times[,] travel[ed] down both legs"; however, Plaintiff stated his pain was "tolerable with pain meds" (R. 589). Plaintiff reported to Dr. Rubi that Dr. Lucci informed Plaintiff that he could not "get more injections" for his back pain because he had "had too many" (R. 590). He diagnosed multilevel disc protrusions without nerve root impingement or significant central canal or foraminal stenosis and mild mid lumbar facet degenerative changes (R. 591-92). An addendum was noted on March 10, 2011, by Dr.Rubi that Plaintiff's achilles and patellar reflexes were normal, bilaterally (R. 592).

Plaintiff's March 10, 2011, MRI of his lumbar spine showed minimal central disc protrusion at T12-L1, which effaced the ventral thecal sac without cord compression or nerve root impingement; minimal disc protrusion at L1-L2 without significant central canal stenosis or

foraminal encroachment; minimal disc bulge at L2-L3 that slightly flattens the ventral thecal sac without significant stenosis of the central canal or neural foramina and no nerve root compression; a disc bulge at L4-L5 that flattens the ventral thecal sac and results in the bilateral foraminal stenosis without apparent nerve root impingement; and minimal central protrusion type radiation at L5-S1 without significant stenosis of the central canal or neural foramina (R. 567-68). The impression was as follows: "[m]ultilevel disc protrusions without nerve root impingement, significant central canal or foraminal stenosis. Mild mid lumbar facet degenerative change" (R. 568). Dr. Rubi noted that Plaintiff's MRI "show[ed] some bulging discs, but no impressive findings by MRI" (R. 591).

Plaintiff's March 15, 2011, PHQ-2 screening for depression, which was administered by Dr. Chan, was "2[,] which [was] a negative screen for depression" (R. 586, 588).

On March 16, 2011, Plaintiff informed Dr. Chan that he had side effects to venlafaxine, which included headache and nausea, and citalopram and mirtazapine, which caused gastrointestinal side effects. Plaintiff reported he could not tolerate trazadone. Plaintiff reported he slept for six (6) hours per night, had a fair appetite, had low energy, had depressed mood, and felt helpless and hopeless "at times." Dr. Chan noted Plaintiff lived alone; he remained in contact with his four (4) children. Plaintiff's mind was not racing (R. 584). Dr. Chan completed a mental status examination of Plaintiff. Dr. Chan found Plaintiff was alert, oriented, engaging, and cooperative. His cognitive functioning, eye contact, insight, and judgment were fair. Plaintiff's motor function was normal. Dr. Chan found Plaintiff's mood and affect were restricted, anxious, depressed and congruent. Plaintiff's speech, thought content, and thought process were normal. Dr. Chan increased Plaintiff's dosage of amitriptyline and instructed Plaintiff to return in four (4) months (R. 585).

On March 18, 2011, Plaintiff was contacted by staff at the VA, as per Dr. Rubi's instructions,

that "neurosurgery state[d] that for his back problem[,] there [was] no surgical intervention at this time[.] [T]hey . . . recommend[ed] [c]onservative treatment" (R. 592).

Plaintiff presented to the VA on August 2, 2011, with "increased confusion[] attribut[ed] to" amitriptyline. Plaintiff scored a ten (10) on the PHQ-9, which was "suggestive of moderate depression" (R. 582). Dr. Sullivan, the on-call psychiatrist at the VA, telephoned Plaintiff on August 3, 2011, to respond to his request for antidepressant medication because he needed "something for my mood." Dr. Sullivan prescribed sertraline (R. 581).

Plaintiff was examined by Dr. Gutta on August 25, 2011, at the VA, for a hernia. Dr. Gutta described Plaintiff as a "50-year-old gentleman who is a physical laborer." Plaintiff stated he did not take any medications; he managed his diabetes with diet. Dr. Gutta noted Plaintiff did not have "cardiac or medical problems." Dr. Gutta stated he would perform the hernia repair after Plaintiff's colonoscopy. Dr. Gutta informed Plaintiff that he could not do any heavy lifting for six (6) months after the hernia repair surgery (R. 580)

Plaintiff's September 15, 2011, chest x-ray showed "no evidence of acute cardioplumonary process" (R. 565).

Plaintiff underwent a screening colonoscopy on September 26, 2011 (R. 602-04). He was diagnosed with diverticulosis (R. 602).

Plaintiff presented to the VA for a pre-operation examination. Plaintiff was scheduled for an October 4, 2011, hernia repair. Plaintiff stated he had no reflux symptoms or abdominal pain. Plaintiff reported he "often" did "some heavy lifting" (R. 576). Plaintiff was cooperative and pleasant; he was in no distress (R. 578). His cranial nerves were intact. He was alert and oriented, times three (3) (R. 579). Plaintiff underwent hernia repair surgery on October 4, 2011 (R. 596-97).

<u>Administrative Hearing</u>

Plaintiff testified he lived alone (R. 20). Plaintiff drove once a week (R. 21). Plaintiff testified he had gotten his GED when he was 16 (R. 22). He had received infantry, airborne assault, ranger, and Old Guard training when he served in the Army (R. 23). Plaintiff stated he did not drink alcohol "much" since he began medicating with pain medications. Plaintiff testified that if could "go without taking a pain pill for three or four days," he would "go out on like a Saturday night and do karaoke thing, but that's the extent of it – or Friday night" (R. 47).

Plaintiff testified his low back pain was the main reason he could not work (R. 29). Plaintiff stated his back pain caused him to be absent from work, which caused him to lose his job with Bruce Hardwood (R. 30). Plaintiff stated he medicated his back pain with hydrocodone, which made him "dumb, . . . stupid, . . . confused." Plaintiff stated he could stand for five (5) or ten (10) minutes before he had to sit. Plaintiff stated he was able to shop by leaning on the cart and he grabbed the furniture in his home to help him keep his balance. Plaintiff testified he had never fallen (R. 39). Plaintiff testified his doctors "took [him] off of [his] pain pills, and then they took away [his] antidepressants" after he had the seizure (R. 40). He then medicated with Zoloft (R. 41). Plaintiff stated he felt "down" every morning (R. 42). Plaintiff stated he would become confused and drive through red lights; he "gave up on the newspaper" because he "got tired of reading the same paragraph over and over and over again." He continued to "scan the classified ads." Plaintiff stated he no longer hunted (R. 43). Plaintiff had no negative outcome from his hernia repair surgery (R. 44). Plaintiff stated he could occasionally, "on certain good days," repair cars. Plaintiff last worked on cars four (4) months earlier (R. 45).

The ALJ asked the VE the following hypothetical question:

Will you assume a hypothetical individual the same age, education, and work experience as the claimant who retains the capacity to perform light work with the following limitations: no more than occasional postural movement, which includes balancing, stooping, kneeling, crouching, and crawling; no climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds. The work should accommodate a sit/stand option that allows the person to alternate sitting or standing positions at 30-minute intervals throughout the workday without breaking task. Work should avoid concentrated exposure to extreme hot and cold temperatures, vibrations, noise, irritants such as fumes, odors, dust, gasses, and poorly ventilated areas. There should be no exposure to hazards, including dangerous machinery and unprotected heights. There should be no operation of any motorized vehicles. Work should be limited to simple, routine, repetitive tasks that involve no strict production line work. There should be no more than occasional interaction with public[,] supervisor and coworkers. Could this hypothetical individual perform any of the past work of the claimant as actually performed or as customarily performed per the DOT? (R. 50-51).

The VE stated such a hypothetical person could not perform the past work of the Plaintiff, but he could perform the job as garment marker and sorter and laundry folder (R. 51-52).

The following questions were asked and answered:

ALJ:  What are the customary tolerances that a typical employer would have as to an employee to late work, having unexcused or unscheduled absences?" (R. 54).

VE:  . . . [I]f an employee's going to be late or absent two or more times per month, that would gain the attention of the supervisory personnel who would attempt an intervention at correcting that, and if it was not successfully corrected it would result in termination (R. 54-55).

ALJ:  And what are the customary number on length of breaks that a typical employer permits during the normal wok day? (R. 55).

VE:  Typically a 15-minute break in the morning, 15 in the afternoon, and then 30 to 60 at lunch, depending on the work site (R. 55).

ALJ:  And what are customary tolerances for how much time during an eight-hour workday would an employer permit an employee to be off-task in addition to regularly scheduled breaks? (R. 55).

VE:  . . . [I]f an employee's going to be off-task 10 percent or more of the time, I believe that completely eliminates the competitive work routine at any level. Some work sites would be more stringent than that (R. 55).

ALJ:    If an individual needed to exceed one or more of these tolerances on a regular basis, the result would be . . . (R. 55).

VE:     An inability to maintain an employment, they would be terminated . . . . (R. 55).

### III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920,  ALJ Swayze made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through March 31, 2011.

2.      The claimant has not engaged in substantial gainful activity since December 1, 2005, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.      The claimant has the following severe impairments: degenerative disc disease; history of single seizure; diverticulitis; and major depressive disorder (20 CFR 404.1520(c) and 416.920(c)) (R. 70).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (R. 71).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he must perform simple, routine, repetitive tasks involving no strict production line work, and only occasional interaction with the public, supervisor(s), and co-worker(s).  He must have a sit/stand option allowing him to alternate sitting or standing positions at 30 minute intervals throughout the work day without breaking task.  He must also work in a controlled environment avoiding concentrated exposure to extreme hot and cold temperatures, vibrations, noise, irritants (such as fumes, odors, dust, gases, and poorly ventilated areas), requiring no more than occasional balancing, stooping, kneeling, crouching, crawling, climbing of ramps/stairs, and no climbing of ladders, ropes, or scaffolds, exposure to hazards (including dangerous machinery and unprotected heights), and/or operation of any motorized vehicles (R. 73).

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565

and 416.965).

7.     The claimant was born on March 11, 1961 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a) (R. 82).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 2005, through the date of this decision (20 CFR 404.1520(g) and 416.920(g) (R. 83).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Additionally, the Fourth Circuit has held that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before

27

a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties[2]

The Plaintiff contends:

1.      The ALJ improperly discounted the claimant's credibility without providing sufficient reasons supported by the evidence in the case record (Plaintiff's brief at p. 5).

2.      The ALJ's finding that the claimant is capable of work that exists in substantial numbers in the national economy is not based on substantial evidence (Plaintiff's brief at p. 7).

The Commissioner contends:

1.      Substantial evidence supports the ALJ's credibility finding.

2.      The ALJ was not required to include limitations in the hypothetical question to the vocational expert that were not supported by the record.

## C. Credibility

Plaintiff asserts that the ALJ "failed to provide . . . specific cogent reasons" and "dismissed

---

[2] Local Rule of Civil Procedure 9.02(g), mandates the following: "References to the Administrative Record: Claims or contentions by the plaintiff alleging deficiencies in the Administrative Law Judge's (ALJ) consideration of claims or alleging mistaken conclusions of fact or law and contentions . . . **must include a specific reference, by page number, to the portion of the record** that (1) recites the ALJ's consideration or conclusion and (2) supports the party's claims, contentions or arguments." In his Memorandum in Support of Motion for Summary Judgment, Plaintiff failed to reference any page number within the administrative record that supported his allegations of error by the ALJ. Except for a reference to page five (5) of the ALJ's decision, wherein the ALJ refers to Exhibit 12F, Plaintiff also failed to name specific evidence which supported his argument (Plaintiff's brief at p. 6).

the findings of the claimant's primary treating physician regarding the intensity and cause of his symptoms" (Plaintiff's brief at p. 6). Defendant asserts there is no merit to Plaintiff's argument (Defendant's brief at p. 12).

The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively,* supra at 989 <u>citing</u> *Tyler v. Weinberger*, 409 F.Supp. 776 (E.D.Va. 1976. The ALJ has a "'duty of explanation'" when making determinations about credibility of the claimant's testimony." <u>See</u> *Smith v. Heckler*, 782 F.2d 1176, 1181 (4th Cir. 1986) <u>citing</u> *DeLoatche v. Heckler*, 715 F.2d 148, 150-51 (4th Cir. 1983); <u>see also</u> *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985). The Fourth Circuit has developed a two-step process for determining whether a person is disabled by pain or other symptoms as set forth in *Craig v. Chater*, 76 F.3d 585 (1996), which reads as follow:

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but the pain the claimant alleges she suffers. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, <u>See</u> 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also *"all the available evidence,"* including the claimant's medical history, medical signs, and laboratory findings, *see* <u>id.</u>; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). <u>See</u> 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of

the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. See 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added.)

*Craig*, supra at 594.

In this case, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . .," thus meeting the first step of the analysis (R. 354). The ALJ was, therefore, required to take into account "all the available evidence" in evaluating Plaintiff's credibility (R. 75). The ALJ found the following:

The claimant is considered only partially credible. While the claimant has medically determinable impairments that could reasonably be expected to produce symptoms, the claimant's testimony and statements describing the duration, frequency, intensity, and other information on the symptoms are not consistent with the objective evidence of record (R. 75).

In his credibility finding, the ALJ closely followed 96-7p, 1996 WL 374186 (S.S.A.), which mandates the following:

PURPOSE: The purpose of this Ruling is to clarify when the evaluation of symptoms, including pain, under 20 CFR 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effect; to explain the factors to be considered in assessing the credibility of the individual's statements about symptoms; and to state the importance of explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision. In particular, this Ruling emphasizes that:

1. No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.

2. When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to

determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

. . .

4. In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case records. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

5. It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

The ALJ discussed the inconsistencies of Plaintiff's statements relative to limitations caused by pain with the considered objective medical evidence, the opinions of doctors, and Plaintiff's own statements. The ALJ analyzed the following objective medical evidence in his decision and his analysis supports his finding as to Plaintiff's credibility: December 23, 2005, lumbar spine x-rays, which showed loss of normal lumbar lordosis frequently correlated with lumbar strain, some degenerative disc disease at L2-L3, L4-L5, and L5-S1, minimal osteophytes, and gentle left convexity centered about the L3 level; May 26, 2009, cervical spine MRI, which showed

degenerative disc disease; August 5, 2009, and February 26, 2010, brain MRIs, made relative to grand mal seizure, which were unremarkable; March 9, 2011, EEG was negative; and March 10, 2011, lumbar spine MRI, which showed "multilevel disc protrusions without nerve root impingement or significant central canal or foraminal stenosis[,] and mild mid lumbar facet degenerative change" (R. 75, 76, 78, 80, 589).

The ALJ completed an exhaustive analysis of the opinions and treatment records of the physicians who treated or evaluated Plaintiff relative to pain. Plaintiff was admitted to the VA hospital for treatment of a grand mal seizure. He was medicated with Dilantin and released. Plaintiff remained seizure free (R. 76-77). Dr. Michels' October 30, 2009, examination was normal. Plaintiff's upper extremity strength and radial pulses were normal. His lower extremity gait, station, and coordination were normal. His pedal pulses and achilles reflexes were 2+ and symmetric (R. 299). On February 10, 2010, Dr. Sabio found Plaintiff had a normal gait and was stable at station. He did not lurch. He had tenderness over the spinous processes of the lumbar spine and T12-L1 tenderness. Plaintiff had no kyphosis or scoliosis. His deep tendon reflexes were normal. He could walk on his heels, on his toes, and heel-to-toe tandem. Plaintiff could stand on either leg separately. Plaintiff could squat halfway due to lumbar spine pain. Plaintiff's fine manipulation movements were normal. Plaintiff's straight leg raising test was restricted to seventy (70) and eighty (80) degrees. Plaintiff's hip flexion was ninety (90) degrees on the right and one-hundred (100) degrees on the left. Plaintiff's neurological examination was normal. He had no muscle atrophy or weakness (R. 78). His motor strength was 5/5 (R. 371). Plaintiff told Dr. Sabio that his lumbar pain radiated to his legs and caused him to lose control of his bladder sometimes and to occasionally fall; however Plaintiff never reported falling to any doctor, he testified at the administrative hearing that he had

never fallen, and the record contains evidence that he only experienced urinary incontinence in August, 2009, when he suffered a seizure (R. 39, 286, 369). Dr. Boukhemis found, on February 26, 2010, that Plaintiff had spondylosis and degenerative disc disease of the cervical spine and degenerative joint disease of the lumbar spine with no evidence of neurological deficit, atrophy, or weakness. Dr. Boukhemis found Plaintiff did not meet a listing for seizures and Plaintiff was "stable off meds" (R. 78, 589). Dr. Reddy found Plaintiff could perform light work with some postural and environmental limitations (R. 79). Dr. Gutta "described [Plaintiff] as a physical laborer" on August 26, 2011 (R. 75). On March 18, 2011, Dr. Rubi noted Plaintiff could no longer work as a mechanic and that "neurosurgery . . . recommend[ed] [c]onservative treatment" of Plaintiff's back condition (R. 80, 592). Plaintiff's hernia repair was successful on October 4, 2011. Plaintiff was instructed by Dr. Gupta to not lift over twenty (20) pounds for the next six (6) months (R. 81).

The ALJ also thoroughly evaluated the record and gleaned various statements by the Plaintiff that were inconsistent with his alleged levels of pain. The ALJ considered Plaintiff's October 30, 2009, statements to the VA doctor that his "upper extremity paresthesias complaints had resolved during his hospital stay in August 2009." Plaintiff stated he experienced mid thoracic pain, which was exacerbated by lying on "'a hardboard creeper[]'" or by lying supine on a hardwood floor, but not otherwise by lying supine." The ALJ noted that "[o]ne would wonder why the claimant was on a hardboard creeper, which is used mostly by vehicle mechanics, or why the claimant had been lying supine on a hardwood floor . . . " (R. 77). However, on the June 8, 2010, Function Report, Plaintiff wrote he had chronic pain that was exacerbated if he did "anything physical or just move[d] around too much" (R. 74). Then, on August 11, 2010 Plaintiff stated his back pain had decreased and he decided he did not want to take prescribed medications due to the sexual side effects (R. 80, 536).

Additionally, on December 10, 2010, Plaintiff informed Dr. Chan his pain was under "fairly good control" (R. 80). On January 22, 2010, Plaintiff stated his pain was zero (0) on a scale of one (1) to ten (10) and his function had "improved" (R. 428-29). Plaintiff told Dr. Sabio, on February 10, 2010, that he realized significant relief with Zantac for his GERD symptoms (R. 78). Prior to his hernia repair, Plaintiff stated he had no reflux symptoms or abdominal pain (R. 576). Additionally, Plaintiff's statements about his alcohol consumption were inconsistent. On August 9, 2010, Plaintiff told Dr. Chan he drank alcohol two (2) to four (4) times a month (R. 540). Just two days later, he told Psychologist Summers he drank a "beer or two daily with friends" (R. 536-37). Plaintiff informed Dr. Joseph that he was "technically blind in his right eye" (R. 275). There is no evidence of this limitation in the record.

The ALJ considered Plaintiff's statements about the effects that medication had on his pain. On August 26, 2009, Plaintiff informed the doctor at the VA that he had stopped medicating with all medications, including Dilantin, which had been prescribed for treatment of grand mal seizure. Plaintiff stated epidural injections provided three (3) weeks of back pain relief (R. 76). Plaintiff repeatedly stated he continued to get "good relief from injections for lumbar spinal stenosis and lumbar disc displacement" and remained active. On November 24, 2009, Plaintiff stated his pain was "four on a one-to-ten pain scale" (R. 77). On December 30, 2010, Plaintiff told Dr. Vogt he stopped medicating with mirtazapine "because he felt sedated in the morning." He had no other side effects from medication (R. 595). Plaintiff informed Dr. Sabio, on February 10, 2010, that he did not have "any sex drive," was getting "up and down through the night," and had no energy; however, Plaintiff stated his back pain was relieved for two (2) weeks after an epidural injection, and pain medication gave him significant relief (R. 77-78). Plaintiff informed Dr. Stein, on March 15, 2010, that he

medicated with Dilantin and was restricted from driving (R. 78). Plaintiff stated, at the VA pain clinic on April 8, 2010, that the epidural "shots help[ed] for several months" (R. 421). On the June 8, 2010, Function Report, Plaintiff stated medication caused sexual side effects, lightheadedness, concentration difficulties, drowsiness, and caused him to be "'dim witted'" (R. 74). Plaintiff told Dr. Chan, on August 9, 2010, that his pain was a level zero (0) on a scale of one (1) to ten (10), except when standing (R. 537). On September 1, 2010, Plaintiff informed Dr. Lucci that his pain was zero (0), he continued to get "good relief" from the epidural injections, and he remained active (R. 80). Dr. Lucci noted Plaintiff's physical examination was "improved" and found there was "no shot needed" (R. 527). Plaintiff, however, informed Dr. Rubi, on March 9, 2011, that Dr. Lucci had informed him that he could not get any more epidural injections for his back pain because he had "had too many" (R. 590). Plaintiff also stated his pain was "tolerable with pain meds" (R. 589). The ALJ noted Plaintiff testified, at the administrative hearing, that he could not work due to back pain, which was "three on a one-to-ten pain scale" but than Plaintiff then testified that he had "no pain at all" when he took pain medication and an epidural injection "help[ed] for two weeks"(R. 75).

The ALJ noted inconsistencies in Plaintiff's statements about limitations to his activities due to pain. Plaintiff informed Dr. Joseph that he watched television and attended meetings at the Eagles (R. 76). On Plaintiff's December 19, 2009, Function Report - Adult, Plaintiff wrote that he watched television, sometimes went to the supermarket with his mother, napped, and watched movies until he went to bed. He needed reminded to care for his persona needs. He prepared his own meals (R. 73). He lived alone. His daughter did his laundry and emptied the garbage. Plaintiff did few household chores because "he live[d] in a camper." His mother visited him twice weekly; he went to WalMart with her regularly. He could lift fifty (50) pounds and walk two-hundred (200) feet

before he needed to rest (R. 74). On January 22, 2010, Plaintiff told Dr. Chan that he kept "in touch" with his children "almost daily" and he "had a "new relationship with a young girlfriend"(R. 425). Plaintiff informed Dr. Stein, on March 15, 2010, that he rarely cooked, cleaned, washed dishes, did laundry, did yard work, or gardened. He grocery shopped with help. He could walk short distances. He sat on his porch. He did not read, fish, or hunt. Plaintiff stated his hobby was collecting guns and automobiles. He occasionally changed the oil in his automobile (R. 79). On the June 8, 2010, Function Report, Plaintiff reported he could not drive due to seizures. He watched television all day. He cared for his pets. He rarely cooked or did laundry. He did not do housework. He shopped weekly. He spoke to family members on the phone daily and they visited him. Unlike his earlier Function Report, Plaintiff reported he could lift thirty (30) pounds and walk one-hundred (100) yards before stopping to rest. He did not finish tasks; he did not follow written or spoken instructions well. Plaintiff stated he did not handle stress or changes in routine well (R. 74). Then, on August 11, 2010, Plaintiff informed a VA psychologist, that he cared for his two (2) year old granddaughter "regularly. Plaintiff stated he "would like to be able to do work but did not believe it was likely he would be able to return to his physically demanding job." Plaintiff spent "most of his time with family or some friends and [did] things around his home "'including working on cars for others.'" Plaintiff stated he was not "doing too bad presently." On September 15, 2011, during a VA pre-operation work up for a hernia repair, Plaintiff stated he "'often [did] heavy lifting'" (R. 80-81). Finally, the ALJ noted Plaintiff testified, at the administrative hearing, that if he had not had a pain pill for three (3) or four (4) days, he would "go out on Friday night for Karaoke" (R. 75).

In addition to the above, the ALJ thoroughly evaluated the findings of Dr. Chan relative to Plaintiff's depression, and, in doing so, declined to give significant weight to those opinions.

Plaintiff argues the following:

> In the case at hand[,] the ALJ has failed to provide such specific cogent reasons –
> except to say that the claimant's subjective complaints were not supported by
> objective medical findings. That said, however, the ALJ dismissed the findings of
> the claimant's primary treating physician [Dr. Chan] regarding the intensity and cause
> of his symptoms (see decision at page 15 referring to Exhibit 12F). . . . In the case at
> hand, the record provides ample documentation of consistent statements made by the
> claimant regarding his . . . mental symptoms affecting concentration, persistence and
> pace . . . . Having considered the arguments presented above, it is clear that the
> claimants (sic) statements concerning the intensity, persistence and limiting effects
> of his symptoms were credible (Plaintiff's brief at pp. 6-7).

Defendant asserts the ALJ's credibility determination is supported by substantial evidence. The ALJ

did not "dismiss" Dr. Chan's opinions relative to Plaintiff's concentration, persistence, or pace; he

evaluated those opinions and, based on his evaluation, did gave "less weight" thereto (R. 27, 29).

The Fourth Circuit has held:

> Circuit precedent does not require that a treating physician's testimony "be given
> controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20
> C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

>> [i]f we find that a treating source's opinion on the issue(s) of the
>> nature and severity of [the] impairment(s) is well supported by
>> medically acceptable clinical and laboratory diagnostic techniques
>> and is not inconsistent with the other substantial evidence in [the]
>> case record, we will give it controlling weight.

> [4,5] By negative implication, if a physician's opinion is not supported by clinical
> evidence or if it is inconsistent with other substantial evidence, it should be accorded
> significantly less weight.

*Craig,* supra at 590.

The ALJ evaluated Dr. Chan's April 22, 2010, Mental Impairment Questionnaire [Exhibit

12F]. Dr. Chan diagnosed major depressive disorder, recurrent, and a GAF of forty-five (45). Dr.

Chan reported Plaintiff had poor appetite, anger, and poor impulse control. Dr. Chan found

Plaintiff's prognosis was "very guarded." Dr. Chan found Plaintiff was either unable to meet

competitive standards or had no useful ability to function due to his mental abilities and aptitudes. Dr. Chan found Plaintiff's "current serious symptoms of depression made his pain level worse." Dr. Chan found Plaintiff had moderate restrictions in activities of daily living; extreme difficulties in maintaining social functioning; extreme difficulties in maintaining concentration, persistence, or pace; and four (4) or more episodes of decompensation during a twelve (12) month period, each lasting for at least two (2) weeks. Dr. Chan found Plaintiff was unemployable (R. 79).

The ALJ made the following finding as to Dr. Chan's opinions:

> Less weight is given to the opinion of Dr. Chan, the claimant's treating/examining physician (Exhibit 12F). Although this source did have the opportunity to examine and treat the claimant, the opinion offered is not supported with a rationale or an identification of the signs and laboratory findings[] and is not consistent with the other medical evidence of record as a whole. The opinion essentially adopts the claimant's statements without balance or objectivity. If this statement were accepted, the claimant would essentially be non-functional. It is also noted that more recent records from Dr. Chan indicated higher GAFs (Exhibit 16F, pg. 20[] and 31). There is not consistent support for this opinion in the longitudinal treatment record. Finally, to the extent it opines on the ultimate issue of disability, the opinion treads on an issue reserved for the Commissioner. Hence, it is not entitled to controlling weight under 20 CFR, Section 404.1527 and 416.927).

The ALJ was correct in his finding that any opinion relative to disability is a decision that is reserved to the Commissioner. The opinion expressed by Dr. Chan relative to Plaintiff's disability is an issue reserved to the Commissioner because it is an administrative findings that is dispositive of a case; *i.e.*, that would direct the determination or decision of disability. A statement by a medical source that a claimant is unable to work does not mean that the Commissioner will determine that the claimant is disabled. Section 404.1527(d)(3) expressly provides that the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." Finally, "a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 20 C.F.R. §4041527(d)(1). The opinions of Dr. Chan

cannot, therefore, be accorded controlling weight or even any special significance relative to Plaintiff's being unable to work.

The undersigned finds the opinions of Dr. Chan, as contained in the Mental Impairment Questionnaire, are not supported by the clinical evidence of record. Plaintiff did not participate in significant mental health counseling. Plaintiff stated that he engaged in marriage counseling for three (3) months in 2005 (R. 274). Dr. Chan referred Plaintiff to counseling, and he engaged in only one session with Psychologist Summers on August 11, 2010. Plaintiff informed Dr. Summers that he chose not to take medication because "he believed it was negatively impacting his ability to perform sexually," and he did not need to meet for therapy (R. 36-37, 536). The record contains no hospitalization records for Plaintiff's having been admitted for mental health issues. At the VA, Plaintiff depression was measured with the PHQ-9. On April 10, 2010, Dr. Chan found Plaintiff's score was seven (7), which was "suggestive of mild depression" (R. 549). On March 15, 2011, Plaintiff's PHQ-9 score was two (2), which was negative for depression (R. 586, 588). On August 2, 2011, Plaintiff's score of ten (10) on the PHQ-9 was "suggestive of moderate depression" (R. 582). Plaintiff's GAF, as measured by Dr. Chan, did not support the findings in the Questionnaire. The ALJ noted that "[d]uring the past year[,] the claimant's global assessment of functioning (GAF) scores have been in the mid-50's (Exhibit 16F), which is not consistent with total disability. DSM-IV-TR, page 34, defines a GAF in the mid-50's as moderate symptoms" (R. 75). Plaintiff's GAF was forty-five (45) to fifty (50) on October 22, 2009, and January 22, 2010; forty-five (45) on April 22, 2010; fifty-four (54) on December 30, 2010; and fifty-five (55) on March 16, 2011 (R. 77, 79, 80-81). The findings contained in Dr. Vogt's December 30, 2010, depression screening do not support Dr. Chan's findings. Dr. Vogt found Plaintiff was calm, cooperative, and engaging.

39

Plaintiff's speech and thought process were normal. His mood was depressed and his affect was sad, but his cognitive functioning was intact, insight was good, and judgment was good (R. 595). Finally, Dr. Chan did not include any support within the questionnaire for his finding in that he failed to "explain limitations . . . and include the medical/clinical findings that support this assessment" as instructed to do on the form (R. 488-89).

The ALJ's decision that Dr. Chan's opinion is inconsistent with the evidence in the longitudinal record is supported by substantial evidence. The ALJ noted that Dr. Rosenblum diagnosed Plaintiff with depression, anxiety, and anger on August 10, 2004, after Plaintiff had "quit Zoloft 'cold turkey', (sic) split up with his wife after hitting her (by wife's report)" (R. 75). The ALJ noted that Dr. Joseph diagnosed major depression, recurrent and moderate; anxiety disorder, NOS; and pain disorder on March 10, 2006, and considered Plaintiff's prognosis to be fair. The ALJ considered the August 26, 2009, treatment note from the VA that Plaintiff's depression had worsened "since he stopped Wellbutrin" after he was released from the hospital on August 7, 2009. Plaintiff was "strongly advised to resume Wellbutrin and reported that he would consider that" (R. 76). The ALJ evaluated Dr. Stein's March 15, 2010, diagnoses of pain disorder associated with general medical condition and psychological factors and major depression, recurrent and nonpsychotic. Dr. Stein found Plaintiff's concentration, persistence, and pace were within normal limits (R. 78-79). The ALJ considered Dr. Bartee's March 26, 2010, findings that Plaintiff's mental impairments were not severe and he had mild restrictions of activities of daily living; mild difficulties maintaining social functioning; mild difficulties in maintaining concentration, persistence; or pace; and no repeated episodes of decompensation (R. 79). The ALJ evaluated Dr. Roman's findings that Plaintiff's mental impairments were not severe and he had mild restrictions

of activities of daily living; mild difficulties maintaining social functioning; mild difficulties in maintaining concentration, persistence; or pace; and no repeated episodes of decompensation. (R. 79-80). Psychologist Summers noted, on August 11, 2010, that Plaintiff "denied most mental health related symptoms" (R. 537). None of these doctors found Plaintiff had extreme difficulties in maintaining concentration, persistence, or pace and four (4) or more episodes of decompensation during a twelve (12) month period, each lasting for at least two (2) weeks.

Finally, Dr. Chan's opinions, as noted in the Mental Impairment Questionnaire, are inconsistent with his own findings, as recorded in his treatment notes. Dr. Chan never noted Plaintiff had experienced any episodes of decompensation. In the Questionnaire, Dr. Chan found Plaintiff had experienced four (4) episodes of decompensation. Later in the same Questionnaire, he found Plaintiff had experienced three (3) such episodes (R. 491-93). Dr. Chan's notes contain no evidence to support his finding that Plaintiff had a "[c]urrent history of 1 or more years inability to function outside a highly supported living arrangement with indication of continued need for such an arrangement" (R. 492-93). To the contrary, Dr. Chan repeatedly noted, as did other treating and evaluating physicians, that Plaintiff lived alone (R. 273, 286, 340, 500, 536, 583, 584). On October 22, 2009, Plaintiff reported to Dr. Chan that he slept well, had a fair appetite, felt depressed, and felt hopeless at times (R. 76). Dr. Chan found Plaintiff's thought process was coherent and his cognition, insight and judgment were fair. Dr. Chan diagnosed major depressive disorder, recurrent and moderate, and chronic pain syndrome (50). On January 22, 2010, Dr. Chan noted Plaintiff was divorced and had a "'young girlfriend.'" Plaintiff complained of sexual side effects from the medication (R. 77). Dr. Chan found Plaintiff was oriented. His thought process and thought content were coherent. His cognition, insight, and judgment were fair (R. 425) Dr. Chan diagnosed major

depressive disorder, recurrent and moderate (R. 77). On the date Dr. Chan completed the questionnaire, he noted Plaintiff reported that the current psychological medications were "helpful except sexual side effects." Plaintiff was alert, well groomed, and oriented (R. 413). His speech was normal, fluent, and relevant. Plaintiff's thought process and content were coherent. Dr. Chan found Plaintiff's cognition, insight, and judgment were fair (R. 414). On August 9, 2010, Plaintiff reported to Dr. Chan that medication made his "mood/anger worse" and negatively affected his "sex life." Plaintiff's mind did not race; he slept for six (6) hours per night. He "denied feeling hopeless" and he was depressed "at times" (R. 540). Dr. Chan found Plaintiff was alert, engaging, and oriented. His speech was normal; his thought process and thought content were coherent; his insight, cognition, and judgment were fair. Dr. Chan diagnosed major depressive disorder, moderate (R. 538). On December 30, 2010, Dr. Chan noted Plaintiff was "doing well." Plaintiff slept well and his appetite was good. He tolerated the medication "well with no significant side effects" (80). On March 16, 2011, Plaintiff informed Dr. Chan that he lived alone and his mind was not racing (R. 584). Dr. Chan found Plaintiff was alert, oriented, engaging, and cooperative. His cognitive functioning, eye contact, insight, and judgment were fair. His speech, thought content, and thought process were normal. Dr. Chan increased Plaintiff's dosage of amitriptyline and instructed Plaintiff to return in four (4) months (R. 585). The treatment notes of Dr. Chan do not support his findings in the April 22, 2010, Mental Impairment Questionnaire.

For the reasons stated above, the undersigned finds the ALJ's credibility analysis is supported by substantial evidence.

### D. Vocational Expert Opinion

Without reciting any case law relative to a proper hypothetical, Plaintiff's argument as to the

ALJ's question to the VE is, in part, as follows:

> When asked whether such jobs (garment marker and sorter and laundry folder )could exist if the claimants (sic) concentration was so affected that he could not stay on task for a significant portion of each day. (sic) The (sic) VE's response was in the negative. In his decision, however, the ALJ failed (sic) give proper weight to the testimony of the vocational expert that the jobs he identified would not be available if the claimants (sic) concentration was so affected. Indeed, the ALJ specifically identified the jobs described above as jobs that existed in significant numbers in the national economy that the claimant could perform, (sic) despite the testimony of the vocational expert (Plaintiff's brief at p. 8).

Defendant contends the ALJ was not required to include limitations in the hypothetical question to the VE that were not supported by the record (Defendant's brief at p. 14). The undersigned agrees with the Commissioner. The ALJ did not, as asserted by Plaintiff, ask the VE if the jobs he listed "could exist if the claimant['s] concentration was so affected that he could not stay on task for a significant portion of each day." The ALJ asked the following question to the VE: ". . .[W]hat are customary tolerances for how much time during an eight-hour workday would an employer permit an employee to be off-task in addition to regularly scheduled breaks?" (R. 55). Nonetheless, the undersigned finds the ALJ's hypothetical question included limitations to Plaintiff's concentration that were supported by the record.

The Fourth Circuit has held that "[t]he purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." *Walker v. Bowen*, 889 F.2d 47, 50 (1989). When "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment." *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir.1993) (citing *Walker v. Bowen*, 876 F.2d 1097, 1100 (4th Cir.1989)). The ALJ has great latitude in posing hypothetical

questions and need only include limitations that are supported by substantial evidence in the record.

*Koonce v. Apfel*, 166 F.3d, 1209 (4th Cir. 1999).

The ALJ posed the following hypothetical question to the VE:

Will you assume a hypothetical individual the same age, education, and work experience as the claimant who retains the capacity to perform light work with the following limitations: no more than occasional postural movement, which includes balancing, stooping, kneeling, crouching, and crawling; no climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds. The work should accommodate a sit/stand option that allows the person to alternate sitting or standing positions at 30-minute intervals throughout the workday without breaking task. Work should avoid concentrated exposure to extreme hot and cold temperatures, vibrations, noise, irritants such as fumes, odors, dust, gasses, and poorly ventilated areas. There should be no exposure to hazards, including dangerous machinery and unprotected heights. There should be no operation of any motorized vehicles. Work should be limited to simple, routine, repetitive tasks that involve no strict production line work. There should be no more than occasional interaction with public[,] supervisor and coworkers (R. 50-51).

The VE, based on these limitations, testified that a significant number of jobs existed in the local and national economies that Plaintiff could do.

As noted above, the ALJ's decision to not assign controlling weight to the April 22, 2010, opinion of Dr. Chan (the only evidence of record that contained the opinion that Plaintiff had "extreme difficulties in maintaining concentration" (R. 491) was supported by substantial evidence. The ALJ assigned the "greatest weight" to the opinions of the state-agency physicians, specifically, to the opinions of Dr. Boukhemis, Dr. Reddy, Dr. Bartee, and Dr. Roman and based his residual functional capacity and hypothetical questions thereon (R. 81).

As to Plaintiff's physical limitations, the ALJ considered Dr. Boukhemis' February 26, 2010, opinion that Plaintiff's brain MRI was unremarkable and Plaintiff did not meet a listing as to seizures (R. 78). Dr. Boukhemis found Plaintiff was positive for spondylosis, but he had no weakness or severe sensory deficit (R. 379). Dr. Reddy found that Plaintiff could perform light work with

postural and environmental limitations (R. 79).

As to Plaintiff's mental limitations, the ALJ considered the opinions of Dr. Bartee, who found that Plaintiff had mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation (R. 79). Dr. Roman found Plaintiff's mental impairments were not severe. Plaintiff had mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation (R. 79-80). Additionally, the ALJ considered the findings of Dr. Joseph, who found that Plaintiff's concentration was moderately impaired, and Dr. Stein, who found Plaintiff's concentration was within normal limits (R. 76, 78-79). The ALJ also thoroughly examined Dr. Chan's treatment notes. During all of Dr. Chan's examinations of Plaintiff, he never opined that Plaintiff's concentration was impaired to any degree (R. 302-03, 413, 415-16, 423-25, 537-38, 540, 584-85). The ALJ found, as to Plaintiff's concentration, persistence, or pace, that Plaintiff's had "no more than moderate" limitations (R. 72).

The ALJ made a thorough analysis of the medical evidence and crafted a hypothetical that incorporated all of Plaintiff's limitations that were supported by the relevant evidence of record. The ALJ reduced Plaintiff to light work, with significant exertional and nonexertional limitations. Specifically, as to Plaintiff's concentration, the ALJ's hypothetical question included limiting Plaintiff to "simple, routine, repetitive tasks that involve no strict production line work" and only "occasional interaction with public[,] supervisor and coworkers" (R. 51).

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's hypothetical question to the VE and his reliance on the VE's testimony.

## VI.  RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI.  I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should also be submitted to the Honorable John Preston Bailey,  United States District Judge.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.  28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _11_ day of March, 2013.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE